2024 IL App (2d) 230566-U
No. 2-23-0566
Order filed October 7, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-985 |
| LANORD D. MILES, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's ruling that offenses arose from unrelated conduct was not against the manifest weight of the evidence, thereby justifying extended terms for both crimes.

¶ 2    Following a jury trial, defendant, Lanord D. Miles, was convicted of unlawful possession of a controlled substance containing 15 or more grams of cocaine, a Class 1 felony (720 ILCS 570/402(a)(2)(A) (West 2020)), and two counts of aggravated battery of a peace officer (bodily harm and insulting or provoking contact), both Class 2 felonies (720 ILCS 5/12-3.05(d)(4)(i), (h) (West 2020)). The two aggravated battery convictions merged, and defendant was sentenced to an

extended-term sentence of 17 years' imprisonment for unlawful possession of a controlled substance and a concurrent extended-term sentence of 14 years' imprisonment for aggravated battery of a peace officer (bodily harm). Defendant moved the court to reconsider his sentences, arguing that they were excessive considering various mitigating factors. Defendant never challenged imposition of an extended-term sentence for aggravated battery of a peace officer. The trial court denied the motion, and defendant timely appealed. At issue is whether the offenses of unlawful possession of a controlled substance and the aggravated battery of a peace officer were part of a single course of conduct, thus precluding an extended-term sentence for aggravated battery of a peace officer, the lesser class offense. See generally *People v. Bell*, 196 Ill. 2d 343, 354-55 (2001); see also 730 ILCS 5-8-2(a) (West 2022). We determine that the offenses were not part of a single course of conduct. Accordingly, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Officer Hector Matias of the Village of Island Lake Police Department testified that he was on patrol on June 11, 2022. He was in a marked squad car traveling north on Eastway Drive, a two-lane road in a residential area. In the section Matias was traveling, Eastway was "windy" and "hilly" and had a speed limit of 20 miles per hour. Matias was patrolling the area because residents had complained about speeders.

¶ 5      At 3:45 p.m., Matias saw a vehicle approaching in the southbound lane. Matias's radar measured the vehicle's speed at 33 miles per hour. Matias made a U-turn and activated his emergency lights. The driver, later identified as defendant, immediately stopped on southbound Eastway, just south of Forest Drive. Matias pulled behind defendant.

¶ 6      As Matias approached defendant's vehicle, its driver's side window was halfway down. Matias detected the smell of burnt cannabis coming from the driver's side of the vehicle. Matias

told defendant that he stopped him because he was speeding. Matias collected defendant's driver's license and proof of insurance, returned to his squad car, learned that defendant's driver's license and insurance were valid, and called for backup. Matias explained that he called for backup because he wanted to investigate further the cannabis he smelled.

¶ 7    Before backup arrived, Matias reapproached defendant and asked him about the cannabis smell. Defendant told him that he had just finished smoking. Matias interpreted this to mean that defendant had just finished smoking marijuana in the vehicle. Matias asked defendant to step out of the vehicle, and defendant refused, asking Matias to contact a sergeant. Matias asked defendant if he had any marijuana in the vehicle. Defendant said yes. Matias then asked defendant how much marijuana he had. Defendant replied, "[A] little bit." Matias asked defendant where in the vehicle that marijuana was located. Defendant pointed to a bag on the passenger seat and told Matias it was in there. Matias again asked defendant to step out of the vehicle. Defendant refused. Matias advised defendant that he needed to search the vehicle. Defendant then inquired whether Matias was going to search the entire vehicle, and Matias said yes.

¶ 8    While standing next to defendant's vehicle and calling on his radio to confirm that a sergeant was on the way, Matias saw defendant reach into the center console area of his vehicle. Defendant made some furtive movements and then tossed on the passenger side floorboard a clear plastic baggie containing a white substance. Defendant then put his vehicle in drive and started driving away.

¶ 9    Mattias reached into defendant's vehicle and turned the engine off. The vehicle rolled back. Defendant turned the engine on again. Matias reached into the vehicle with his right hand, trying to unlock the door. Defendant swatted his hand away and rolled the window up. Matias's right bicep, underneath his armpit, became wedged between the window and the door frame. Matias

attempted to remove his right arm, but it was stuck. Matias ordered defendant to park the vehicle and turn it off. Defendant refused. Matias informed defendant that if he did not stop and turn the vehicle off, Matias would tase him. Defendant again refused to follow these orders. Defendant then revved the engine and drove off, heading south on Eastway with Matias stuck and hanging on the driver's side of the vehicle.

¶ 10    Matias, whose gun was on the right side of his utility belt and his taser on the left side, used his left hand to retrieve his taser. He reached into the vehicle with his left arm, pushed the taser against defendant's left arm, and deployed it at defendant. One of the prongs missed defendant, and, thus, defendant was not incapacitated. Matias continued pressing the taser against defendant's arm and attempted to tase defendant a second time. That attempt, like the first, was unsuccessful.

¶ 11    Matias saw a car driving north on Eastway in the opposite lane. "[Defendant] drove toward[] that vehicle." Matias explained that "[defendant] cross[ed] the [dividing] line" and was "[a]pproximately a foot maybe less" away from "hitting that other car." Matias stated, "I was afraid that [defendant] was going to hit—hit me with that [other] car. I was going to be squeezed between both [vehicles]." Matias testified, "I pressed my taser to [defendant's] arm and pushed the—pushed *** his arm which was holding the steering wheel, his right arm, pushed it with the taser toward[ ] the left so [defendant] wouldn't hit me with the other car." Although Matias's action temporarily corrected defendant's steering so that Matias avoided the oncoming car, "[defendant] continually tried swerving into mailboxes in the area" "on the side that [Matias]" was "hanging on[.]" Matias stated that defendant drove in this manner at "40 to 50 [miles per hour]" for half a mile.

¶ 12    Matias "yell[ed] at defendant to stop and let [him] off." Defendant refused. Matias said, "I told [defendant] that if he stopped and let me off, I would just let him go." Defendant "slowed

down to 20 [miles per hour] and told [Matias] to jump off." Matias was unable to do so because the vehicle was still traveling too fast.

¶ 13    Eventually, Matias successfully tased defendant while his right arm was still stuck in the vehicle. Matias threw his taser on the ground, reached back in the vehicle with his left arm, and turned the vehicle off. Because the vehicle was headed toward Illinois Route 176, a busy road, Matias grabbed the steering wheel and turned it to the right, away from Route 176 and toward Fairfield Drive. Because Fairfield declined in that area, the vehicle coasted down Fairfield. Matias freed himself from the vehicle before it crashed into the front porch of a home on Fairfield. Matias estimated that he was stuck in defendant's vehicle for approximately 30 seconds. Matias sustained injuries, which included bruising and lacerations to his right arm.

¶ 14    Two women who lived in the area testified that they saw defendant dragging Matias down Eastway. They described how Matias was lifted off the ground as defendant sped down the street. One of these witnesses also stated that Matias warned defendant not to drive off while Matias's arm was stuck in the vehicle and that Matias screamed about 20 times for defendant to stop the vehicle. While driving, defendant "was almost like *** shaking like he was going to shake [Matias] off."

¶ 15    After the vehicle crashed, Matias searched it, finding the baggie that defendant had thrown on the passenger side floorboard. The baggie contained "a mix of a white powdery substance and *** a big chunky, rock-like, waxy substance." Matias found wedged in the driver's door a clear plastic baggie containing a similar substance. Sergeant James Gainer, who was on his way to the scene as backup when he heard Matias radio " '[s]end help quick, ' " assisted in arresting defendant and found on his person a small baggie of a white powdery substance. Officer Allison Seubert, who arrived at the scene after Gainer, collected and properly sealed the controlled substances found

in defendant's possession. Forensic testing revealed that the substances weighed over 21 grams and contained cocaine.

¶ 16    Defendant was transported to the hospital, where Matias spoke to him. Matias asked defendant why he fled, and "[defendant] said because he felt he wasn't speeding."

¶ 17    Matias's 8 minute and 17 second squad car video was presented during trial. The video showed Matias driving north on Eastway, a narrow two-lane street in an area with rolling hills. Eastway had negligible shoulders and no sidewalks. The video was consistent with Matias's testimony. It showed, additionally, that defendant, during the initial stop, admitted driving 25 miles per hour to Matias. The video also depicted that later, after defendant had imprisoned Matias's arm and drove off, Matias warned defendant he would be tased if he did not stop the vehicle, and defendant responded, "Go ahead."

¶ 18    Defendant neither testified nor presented any evidence.

¶ 19    The jury found defendant guilty of unlawful possession of a controlled substance containing 15 or more grams of cocaine and two counts of aggravated battery of a peace officer (bodily harm and insulting or provoking contact). Defendant filed a posttrial motion, and the trial court denied it.

¶ 20    The probation department prepared a presentence investigation report. Defendant "related [to the interviewer] that he drove away because [Matias] tased him which made his foot step on the gas."

¶ 21    At the sentencing hearing, the State argued that extended-term sentencing was appropriate because defendant was convicted of a Class 1 felony in 2016. See 730 ILCS 5/5-5-3.2(b)(1) (West 2022) (permitting an extended-term sentence where the defendant was previously convicted of the same or greater class felony within 10 years of the previous conviction "and such charges are

separately brought and tried and arise out of different series of acts"); *id.* § 5-4.5-30(a) (extended-term sentence for a Class 1 felony is 15 to 30 years); *id.* § 5-4.5-35(a) (extended-term sentence for a Class 2 felony is 7 to 14 years). Although the State did not expressly state that extended-term sentencing was appropriate for only the Class 1 unlawful possession of a controlled substance conviction, it appears that this was the State's contention, as it asserted that "defendant is facing up to thirty years on an extended sentence." The court merged the two aggravated battery convictions and sentenced defendant to an extended term of 17 years for unlawful possession of a controlled substance and a concurrent extended term of 14 years for aggravated battery of a peace officer.

¶ 22    In sentencing defendant, the court determined that *Bell*, *supra,* and *People vs. Fontanez-Marrero*, 2023 IL App (2d) 220128, ¶ 28, allowed an extended-term sentence for both the Class 1 and Class 2 felonies because the crimes were separately charged different classes of offenses that arose from unrelated courses of conduct. Specifically, the court noted:

> "[W]hen you had those drugs when you were in the car at the time leading up to and, say, during the traffic stop until you were separated from them your objective was to possess those drugs ***. When you did the conduct underlying the aggravated battery that the jury found you guilty of this Court has to determine [w]hether your objective was the same or whether it came from a separate course of conduct. Simply put, there's nothing really related to an objective of possessing narcotics and an objective of committing an aggravated battery on a peace officer. This is not [like those cases where] flight from a robbery scene where what happens during a flight from a robbery is you commit a robbery, you've got to flee, you don't stick around. That makes sense. People can possess narcotics for a long, long time. Nothing really to flee from. But then you interacted with police and

you had a new objective and that was to batter, drag the officer. Much more similar to the conduct of the defendant in *Fontanez*[-]*Morraro* [*sic*], who had strangled and beaten his girl friend [*sic*] and then tried to elude the police officer."

The court also observed that "[a] *** person can possess *** cocaine and commit this offense and cooperate with the police, not hurt anybody as part of the arrest, but that wasn't the choice you made."

¶ 23    Defendant moved the court to reconsider his sentence, arguing that it was excessive given various mitigating factors. Nowhere in the motion did defendant argue that the trial court erred in imposing an extended-term sentence on the Class 2 felony, *i.e.*, the aggravated battery. The court denied the motion.

¶ 24    This timely appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26    Defendant argues that an extended-term sentence for aggravated battery of a peace officer was improper because the aggravated battery and the unlawful possession of a controlled substance were part of a single course of conduct. In so arguing, defendant acknowledges that he forfeited review of the issue by failing to raise it in the trial court. See *People v. Enoch*, 122 Ill. 2d 176, 198 (1988) (to avoid forfeiting issue for appeal, appellant must raise the issue in the trial court and in a posttrial motion). However, he argues that his forfeiture should be excused under the plain error rule.[1] See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.").

_____

[1]Although it seems that defendant's argument could be subject to harmless error review, as his aggregate sentence of 17 years will not change even if we vacate his 14-year sentence, we note

¶ 27    To establish plain error "[i]n the sentencing context, a defendant must *** show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *Id.* "If the defendant fails to meet his burden, the procedural default will be honored." *Id.*

¶ 28    Defendant argues that we may review the issue he raises under the second prong of plain error. Our ability to do so depends first on whether an error occurred. See *People v. Logan*, 2024 IL 129054, ¶ 53 ("The first step in applying the plain error doctrine is to determine whether error occurred."). Accordingly, we first consider whether error arose when defendant was sentenced to an extended term for aggravated battery of a peace officer.

¶ 29    When a defendant is convicted of a Class 2 felony, like aggravated battery of a peace officer (see 720 ILCS 5/12-3.05(h) (West 2020)), he faces a sentence between three and seven years. 730 ILCS 5/5-4.5-30(a) (West 2022). An extended-term sentence for a Class 2 felony is 7 to 14 years. *Id.* Defendant does not dispute that his 14-year extended-term sentence for aggravated battery of a peace officer fell within the statutory range. Rather, he claims that imposition of an extended-term sentence for aggravated battery of a peace officer was improper.

¶ 30    Section 5-8-2(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-2(a) (West 2022)) governs the imposition of an extended-term sentence and provides in relevant part:

---

that it is not, because defendant never preserved the issue he raises now. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) ("When a defendant has forfeited appellate review of an issue, the reviewing court will consider only plain error. [Citation] Harmless-error analysis is conducted when a defendant has preserved an issue for review. [Citation].").

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by [section 5-4.5-35 of the Code (*id.* § 5-4.5-35)] for an offense or offenses within the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in [s]ection 5-5-3.2 [of the Code (*id.* § 5-5-3.2)] or clause (a)(1)(b) of [s]ection 5-8-1 [of the Code (*id.* § 5-8-19(a)(1)(b))] were found to be present." *Id.* § 5-8-2(a).

¶ 31    The plain language of section 5-8-2, to which we must defer (see *People v. Sandoval*, 2023 IL App (2d) 220155, ¶ 21), allows for an extended-term sentence only on "the class of the most serious offense of which the offender was convicted," and then, an extended term is appropriate only if certain aggravating factors were found (see *Fontanez-Marrero*, 2023 IL App (2d) 220128, ¶ 26). Defendant does not challenge whether those aggravating factors were present here. He argues only that (1) the Class 2 felony of aggravated battery of a peace officer was not the most serious offense of which he was convicted, and (2) because the possession and aggravated battery offenses "stemmed from the same criminal objective, which was to maintain possession and prevent discovery of the drugs inside the vehicle[,]" imposition of an extended term for aggravated battery of a peace officer was improper.

¶ 32    Our supreme court "interpret[ed] section 5-8-2(a) of the *** Code *** [citation] to allow for the imposition of extended terms on separately charged, differing class offenses that arise from *unrelated courses of conduct* regardless of whether the cases are separately prosecuted or consolidated." (Emphasis added.) *People v. Coleman*, 166 Ill. 2d 247, 257 (1995). In determining whether offenses arise from "unrelated courses of conduct" for purposes of section 5-8-2(a) of the Code, our supreme court has held "that the section 5-8-4(a) test—whether there was a 'substantial change in the nature of [defendant's] criminal objective'—is the proper test for determining

whether multiple offenses arise from an "unrelated course of conduct" pursuant to section 5-8-2(a)." *Bell*, *id*. at 351 (employing the test formerly used to determine whether consecutive sentences should be imposed under section 5-8-4(a) of the Code (730 ILCS 5/5-8-4(a)(i) (West 2000))). Thus, whether an extended-term sentence under section 5-8-2(a) may be imposed for a conviction on a less serious class of crime depends on "whether there was a 'substantial change in the nature of [the defendant's] criminal objective[.]' " *Id*. at 351. The court explained:

> "If there was a substantial change in the nature of the criminal objective, the defendant's offenses are part of an 'unrelated course of conduct' and an extended-term sentence may be imposed on differing class offenses. If, however, there was no substantial change in the nature of the criminal objective, the defendant's offenses are not part of an unrelated course of conduct, and an extended-term sentence may be imposed only on those offenses within the most serious class." *Id.* 354-55.

¶ 33 "The test to be used in determining whether a particular offense is part of a single course of conduct, during which there was no *** change in the nature of the criminal objective, is the independent motivation test; that is, were the defendant's acts independently motivated?" *People v. Harris*, 220 Ill. App. 3d 31, 32 (1991) (reviewing a consecutive sentence). Acts are "independently motivated" if they are not part of an overarching criminal objective. *People v. Sergeant*, 326 Ill. App. 3d 974, 988 (2001) (reviewing a consecutive sentence). That is, as relevant here, we must consider (1) whether defendant's motivation to commit unlawful possession of a controlled substance was independent of the motivation to commit aggravated battery of a peace officer or (2) whether both offenses were guided by the same overarching criminal objective. *Id*.

¶ 34 We review for manifest error the trial court's finding that there was a substantial change in the nature of the criminal objective from defendant's commission of unlawful possession of a

controlled substance to his commission of aggravated battery, *i.e.*, that the offenses arose from unrelated courses of conduct. See *Fontanez-Marrero*, 2023 IL App (2d) 220128, ¶ 29. Manifest error arises when the error complained of is clearly evident, plain, and indisputable. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).

¶ 35    We determine that the trial court's ruling that defendant's offenses were not part of a single course of conduct or overarching criminal objective did not amount to manifest error. The record supports the trial court's conclusion that defendant had a new motivation when he injured Matias. For example, when Matias spoke with defendant at the hospital, defendant did not indicate that he drove away because he did not want Matias to confiscate the cocaine in his vehicle. Rather, defendant explicitly stated that he sped away "because he felt he wasn't speeding." Similarly, defendant told the probation interviewer that he drove away not to maintain possession of the cocaine but because the tasing "made his foot step on the gas." Defendant quarrels with these facts and points to contrary evidence in the record. We find defendant's arguments unhelpful. What matters here is not the veracity of his statements to others concerning his intentions but, rather, whether the record supports the trial court's decision that there was a substantial change in the nature of defendant's criminal objective.

¶ 36    Claiming that "[his] only intent was to maintain possession of the drugs and any harm to Officer Matias occurred only to the degree it was necessary to effectuate that objective[,]" defendant argues that the unlawful possession of a controlled substance and the aggravated battery of a peace officer were committed as part of a single course of conduct. But the trial court concluded otherwise, and the record shows that after defendant attempted to drive away, rolling his window up and trapping Matias's right arm in the vehicle, he did not simply leave the scene. Rather, he sped on a wild ride toward oncoming traffic and various mailboxes in the area,

attempting to hit Matias with them and drove at 40-50 mph towards the busier Route 176 where the danger to Matias would have been increased. All the while, Matias begged him to stop and offered to let him go. The *manner* in which defendant drove away from the location of the stop supports the conclusion that he intended much more than simply to maintain possession of the cocaine, *i.e.*, he attempted to harm Matias.

¶ 37 Defendant contends *People v. Arrington*, 297 Ill. App. 3d 1 (1998) and *People v. Robinson*, 2015 IL App (1st) 130837, control. We find *Arrington* and *Robinson* distinguishable.

¶ 38 In *Arrington*, the defendant was convicted of attempted robbery and aggravated battery. *Arrington*, 297 Ill. App. 3d at 2, and sentenced consecutively. The aggravated battery occurred when, after the defendant attempted to rob the service desk employee of a supermarket, he struck the manager who blocked the defendant's exit and ordered the defendant to stop. *Id.* On appeal, this court modified the consecutive sentences, holding that the offenses were committed as part of a single course of conduct during which there was no substantial change in the defendant's criminal objective. *Id.* at 6. We asserted:

> "Here, the jury's verdict clearly shows that [the] defendant's criminal objective was to rob the store. We believe that inherent in any plan to rob a store is also an intention for the robber to escape from the premises with the purloined proceeds. The evidence shows that defendant battered the manager only after he blocked [the] defendant's escape route. [The d]efendant's motivation for striking the manager was not a newly conceived intention to inflict harm, but an attempt to complete his original plan, namely, the robbery of and escape from the store." *Id.* at 5.

¶ 39 In *Robinson*, the defendant was convicted of residential burglary and aggravated battery. *Robinson*, 2015 IL App (1st) 130837, ¶ 1. Evidence presented at trial revealed that the defendant

entered the victim's apartment, attempted to steal the victim's television, ran at the victim who was blocking the defendant's exit, and bit the victim's lip during a subsequent struggle. *Id.* ¶ 11. The trial court found the defendant intended to rob the victim. *Id.* at ¶ 108. Without providing any reasoning, the trial court sentenced the defendant to 30 years' imprisonment for burglary and a concurrent extended-term sentence of seven years for aggravated battery. *Id.* ¶¶ 42, 103.

¶ 40    At issue on appeal was whether an extended-term sentence for aggravated battery was proper because it was of a lesser class than the residential burglary of which the defendant was convicted and sentenced. *Id*. ¶ 100. The appellate court determined that an extended-term sentence for aggravated battery was improper because the residential burglary and the aggravated battery were committed as part of a single course of conduct. *Id.* ¶ 107. That is, "to finish what [the defendant had started," the attack had no objective independent of the original plan. *Id.* ¶ 108. Following *Arrington*, the court explained, "It seems merely common sense that a burglar who is attempting not to be detected maintains a constant objective to escape throughout the burglary, regardless of how he or she may have to effectuate that escape." [2] *Id.* ¶ 107.

¶ 41    We find neither *Arrington* nor *Robinson* persuasive here. In those cases, the aggravated batteries were part of a single course of conduct of the attempted robbery and the residential burglary because the robbery and residential burglary both required the defendants to flee from the

_____

[2]The court also observed that, because the defendant's conviction of home invasion was vacated posttrial by the trial court based on the fact that he was trying to leave when he encountered the victim, he necessarily did not have an independent objective to harm the victim. See 720 ILCS 5/19-6(a) (West 2022) (home invasion requires, among other things, entering or remaining in the dwelling of another with knowledge of the presence of another).

scene with ill-obtained property, *i.e.*, to *take* property away from another by force or threat of force. See 720 ILCS 5/18-19(c) (West 2020) ("A person commits robbery[, a Class 2 felony,] when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force."); *id.* § 19-3 ("A person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another, or any part thereof, with the intent to commit therein a felony [such as robbery] or theft.").

¶ 42   As *Robinson* suggests, taking property cannot happen if the property remains with the rightful owner or in the rightful possessor's possession. That is, the property must be removed from the rightful owner or possessor's possession to complete the offense of robbery (*Arrington*) and residential burglary (*Robinson*). In contrast, unlawful possession of a controlled substance does not require fleeing from the scene. As the trial court observed, there is "[n]othing really to flee from" when committing the unlawful possession of a controlled substance. And, unlike robbery and residential burglary, there is no requirement that the defendant use force or the threat of force to unlawfully possess a controlled substance. Rather, as noted by the trial court, "[a] *** person can possess *** cocaine and commit this offense and cooperate with the police, not hurt anybody as part of the arrest[.]" Given that, the trial court found, "there's nothing really related to an objective of possessing narcotics and an objective of committing an aggravated battery on a peace officer."

¶ 43   Defendant also argues that this case is unlike *Fontanez-Marrero*, on which the trial court relied. There, the defendant was convicted of resisting a police officer for which he received an extended sentence and various offenses related to an attack on his girlfriend at her home, including aggravated battery by strangulation, a Class 1 felony. *Fontanez-Marrero*, 2023 IL App (2d)

220128, ¶ 3. The resisting was predicated on the defendant fleeing and pushing a police officer in pursuit. *Id.* ¶ 6. On appeal, the defendant argued that an extended-term sentence for resisting a police officer, a Class 4 felony, was improper because it was not the most serious class offense of which he was convicted. *Id.* ¶ 26. We determined that an extended-term sentence on the lesser offense was proper because the resisting-a-police-officer conviction was part of a separate course of conduct from strangling his girlfriend. *Id.*

¶ 44     After distinguishing *Arrington* and *Robinson*, we observed:

> "[T]he objective of the earlier offenses was to terrorize [the girlfriend]. That purpose was fully accomplished when [the] defendant committed the acts inside the house. Unlike the robber's flight from the store in *Arrington*, or the burglar's flight from the premises in *Robinson*, [the] defendant's flight from [the officer] was not necessary to effectuate [the defendant's] purpose—namely, to undertake violent acts against a separate person in a different location." *Id.* ¶ 34.

¶ 45     Although the offenses defendant committed here occurred in the same place and at the same time, unlike in *Fontanez-Marrero* where they occurred in sequence, we cannot conclude, as *Arrington* intimated, that the location and simultaneous commission of the crimes is pivotal. See *Arrington*, 297 Ill. App. 3d at 5-6 (after addressing a case where the offenses were committed at a different time and place, we noted that "[t]he aggravated assault occurred immediately after and only a few feet from the attempted robbery," but, additionally, we observed that "[the] defendant committed the aggravated battery merely to effectuate his original intent to rob the store and escape from the premises"); but see *People v. Ancheta*, 2022 IL App (2d) 210126-U, ¶¶ 2, 6-7, 45 (affirming an extended-term of imprisonment for unlawful possession of a controlled substance although a higher class weapons offense was committed simultaneously, where the defendant

stated that he carried a gun not to aid in possessing the drugs but to " 'defend[ ] [his] life[,]' " an unrelated objective). We see no reason why, as in this case, a defendant cannot have unrelated criminal objectives and independent motivations that overlap as the crimes are committed. See *Ancheta*, 2022 IL App (2d) 210126-U, ¶¶ 2, 6-7, 45.

¶ 46 Finally, although some offenses, like robbery and residential burglary, may require an offender to flee from the scene, neither unlawful possession of a controlled substance nor aggravated battery of a peace officer do. We, thus, reject the notion that all criminal pursuits necessarily include an escape and that, as defendant suggests, extended-term sentencing on his lesser offense is improper simply because he tried to flee. In sum, the trial court's conclusion that the offenses were part of an unrelated course of conduct and that defendant's objective to possess the cocaine he had in his vehicle changed to *"a new objective and that was to batter, drag the officer"* is not against the manifest weight of the evidence. Accordingly, extended-term sentencing for the aggravated battery of a peace officer, the lesser class of offense, was proper, and defendant's forfeiture stands. *Hillier*, 237 Ill. 2d at 545.

¶ 47                                   III. CONCLUSION

¶ 48 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 49 Affirmed.